STATE OF NEW YORK EX REL. EDELWEISS FUND, LLC, Plaintiff,

against
JPMORGAN CHASE & CO., CITIGROUP, INC.,M & T BANK CORPORATION, WELLS FARGO & COMPANY, MERRILL LYNCH & CO., INC.,MORGAN STANLEY SMITH BARNEY LLC,JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC,J.P. MORGAN SECURITIES, INC.,CITIBANK, N.A, CITIGROUP GLOBAL MARKETS, INC.,CITIGROUP FINANCIAL PRODUCTS, INC.,CITIGROUP GLOBAL MARKETS HOLDINGS, INC.,M & T BANK, BANK OF AMERICA CORPORATION, BANK OF AMERICA N.A., BANC OF AMERICA SECURITIES LLC,MERRILL LYNCH, PIERCE, FENNER & SMITH INC.,BOFA MERRILL LYNCH ASSET HOLDINGS, INC.,MORGAN STANLEY, MORGAN STANLEY & CO. LLC,MORGAN STANLEY BANK, N.A., MORGAN STANLEY CAPITAL SERVICES INC.,MORGAN STANLEY CAPITAL GROUP INC., Defendant.


Index No. 100559/2014

 For plaintiffs, Constantine Cannon (Gordon Schnell, Joel A. Chernov, Chaim Alexander Cohen, and Noelle Marie Lasso), 335 Madison Avenue, 9th Floor, New York NY 10017
For defendants, Paul Weiss Rifkind Wharton & Garrison (Jane Baek O'Brien, Susanna Buergel, Luke Flynn-Fitzsimmons), 2001 K St. NW, Washington DC, 20006; Greenberg Traurig LLP (Harold Shaftel), 200 Park Avenue, NY NY 10166; Hodgson Russ LLP (Aaron Maurice Saykin and Robert Joseph Fluskey), 140 Pearl Street, Suite 100, Buffalo NY 14202; Wilmer Cutler Pickering Hale and Dorr, LLP (Joseph Randall Gay), 1875 Pennsylvania Ave. NW, Washington DC 20006
And, Bryan Paul Kessler, Office of the Attorney General, State of New York, 28 Liberty Street, New York, NY 10005, for the State of New York.


Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 006) 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 109, 110, 112, 113, 114, 115, 116, 126, 127, 129 were read on this motion to/for DISMISSAL
The following e-filed documents, listed by NYSCEF document number (Motion 007) 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 111, 117, 118, 119, 120, 121, 122, 123, 124, 125, 130, 147 were read on this motion to/for DISMISS
Upon the foregoing documents, (i) the defendants' joint motion (mtn. seq. no. 007) to dismiss the [*2]second amended complaint (hereinafter, the Complaint) pursuant to CPLR §§ 3211(a)(1), (a)(7), 3016(b), and the New York False Claims Act, State Finance Law § 187, and (ii) M & T Bank Corporation's (M & T) motion (mtn. seq. no. 006) to dismiss pursuant to CPLR §§ 3211(a)(1) and (a)(7) are both denied.
RELEVANT FACTUAL BACKGROUND
This is a qui tam action pursuant to the New York False Claims Act (NYFCA) brought by Edelweiss Fund, LLC as relator (Relator) on behalf of the State of New York. Relator alleges that the defendants — financial institutions and their subsidiaries  have collectively engaged and conspired to engage in a decade's-long fraudulent scheme in connection with resetting interest rates for certain municipal bonds known as Variable Rate Demand Obligations (VRDOs). Like other states, New York issues VRDOS to raise money to fund various long-term projects and infrastructure, such as airport, port, transportation, and affordable housing facilities (NYSCEF Doc. No. 56, Compl., ¶ 22). New York engaged the defendants as remarketing agents (RMAs) to market and price the VRDOs at the lowest possible interest rates and paid them fees to perform said services (id., ¶¶ 1-2). The defendants allegedly represented that they would (i) reset interest rates for VRDOs at the lowest possible rate, and (ii) do so "actively and individually" based on an assessment of each bond's unique "characteristics." 
According to the Complaint, however, the defendants did not perform these services as promised and instead engaged in "robo-resetting" the interest rates by using an "algorithm or some other mechanical basis" to reset the rates by placing the bonds with different characteristics in the same buckets and applying the algorithm without considering the individual bond characteristics, the associated market conditions, or investor demand, and, thus, breached their obligations to set the rate at the lowest possible rate to trade at par. The Complaint further alleges that the defendants "robo-reset" these rates in the manner they did in order to keep the bonds in the hands of their holders and therefore alleviate the need for the defendants to remarket the bonds so as to collect tens of millions of dollars in annual remarketing fees without providing the remarketing services for which New York allegedly paid them (id., ¶¶ 2-3). 
Beyond simply "robo-resetting" the interests rates, Relator also alleges that the defendants failed to set the rates at the lowestpossible interest rates, as their agreements with the State of New York allegedly required, and instead employed the "robo-resetting" algorithm to collectively impose artificially high interest rates on the VRDOs, which was the opposite of what New York hired them to do (Compl., ¶ 3). Relator alleges that the defendants benefited from keeping the VRDO interest rates artificially high because it caused VRDO investors — who are typically tax-exempt money market funds, which the defendants in many instances own or manage — to hold on to the bonds rather than redeem them at face value plus interest (id., ¶ 4). This "put" option is one of the defining features of a VRDO, and it is the responsibility of the remarketing agent to find another investor when the "put" option has been exercised (id.). If the remarketing agent is unable to find another investor, a liquidity provider (who is often the remarketing agent itself) must step in and purchase the VRDO from the redeeming investor (id., ¶ 25). Thus, Relator alleges, by setting the rates for VRDOs artificially high, the defendants assured that the holders of the bond would not exercise the "put" option and the defendants would not have to find other investors to purchase the bonds or buy the bond themselves (id.). In other words, the defendants' [*3]so-called "robo-resetting scheme" allowed them to extract substantial fees from New York for remarketing services that they did not provide and allowed the defendants to extract fees as the liquidity provider, typically through guaranteeing the VRDO with a letter of credit (LOC), even though the risk of needing to draw on that letter of credit was substantially nonexistent (id., ¶ 5).
According to the Complaint, the defendants' obligations (i.e., to set VRDO interest rates at the lowest possible rate, and to actively remarket at the lowest possible rate the VRDOs to other investors when the existing investor "puts" the bond back to the RMA for a return of its investment) are set forth in at least three sources: (1) the Municipal Securities Rulemaking Board (MSRB), (2) the Securities Industry and Financial Markets Association (SIFMA) Model Disclosures, and (3) the actual remarketing agreements between the defendants and New York (id., ¶¶ 27-40). The MSRB is a self-regulatory organization that writes rules to regulate brokers, dealers and banks (see 15 USC § 780-4[b]). MSRB Rule G-17 requires RMAs to "deal fairly with all persons and [] not engage in any deceptive, dishonest, or unfair practice," and Rule G-18 requires RMAs to "make a reasonable effort to obtain a price for the customer that is fair and reasonable in relation to prevailing market conditions." (Compl., ¶¶ 32-33). 
SIFMA is an industry trade group. Its model disclosures provide that RMAs are "requires to set the interest rate at the rate necessary, in its judgment, as the lowest rate that permits the sale of the VRDOs at 100% of their principal amount (par) on the interest reset date" (Compl., ¶ 34). 
The Complaint also alleges that the actual remarketing agreements between the defendants and New York "contain provisions requiring [d]efendants to set and actively remarket the VRDOs they manage at the lowest possible rates and based on an individual determination" (id., ¶ 35). By way of example, the Complaint points to a:
Remarketing Agreement for VRDOs totaling $420,000,000 (collectively, the "Series 2008A Bonds," with each individual bond consisting of a unique "Subseries 2008A" number) issued by the New York State Urban Development Corporation dated June 24, 2008, [wherein] JP Morgan stated that the Remarketing Agent agreed to "comply with all applicable laws, including the Rules of the Municipal Securities Remarking Board in connection with each remarketing of Bonds" and to "use its best efforts to remarket the Bonds during any Daily Rate Period and any Weekly Rate Period at the Purchase Price"
(id., ¶ 37).
According to the Complaint, the "corresponding Service Contract for these VRDOs also states that the Remarketing Agents shall determine the Weekly Rates "separately for each subseries" (id., ¶ 38). Additionally, "the corresponding Offering Circular for the Series 2008A Bonds states that the interest rates 'shall be determined by the Remarketing Agents to be the rate that in the judgment of the Remarketing Agent, having due regard for the prevailing financial market conditions for bonds or other securities of the general nature as such Series 2008A Bonds would be the lowest interest rate that would enable such Series 2008A Bonds to be sold at a price of par, plus accrued interest, if any" (id., ¶ 39). The Complaint also alleges that "various official statements and remarketing circulars contained language consistent with Defendants' contractual [*4]obligations and regulatory duties" (id., ¶ 40). Thus, by way of another example,
[A]n offering statement dated June 18, 2008, concerning hundreds of millions in VRDOs issued by the New York Local Government Assistance Corporation and remarketed by JP Morgan, [Bank of America], and Morgan Stanley, among others, states: "Pursuant to its Remarketing Agreement, the Remarketing Agent is required to determine the applicable rate of interest that, in its judgment, is the lowest rate that would permit the sale of the applicable [VRDO] The interest rate will reflect, among other factors, the level of market demand for the [VRDOs]"
(id., ¶ 40).
Most significantly, Relator relies on a forensic analysis of the defendants' rate-setting practices between April 1, 2009 to November 13, 2013 to suggest that the defendants grouped the vast majority of the VRDOS they managed into "bucket" collections of unrelated bonds and set their interest rate collectively in violation of their obligations (id., ¶ 44 [emphasis added]). Relator alleges that since April 2009, the defendants overcharged New York by paying for remarketing services that the Defendants did not provide, inflating and collectively setting VRDO interest rates, and collecting excessive LOC fees for LOC services that they were rarely called upon to perform as a result of their rate setting scheme (id., ¶ 6). Altogether, Relator estimates that the pre-trebled damages to New York amount to $374 million (id., ¶ 126).
The Complaint asserts a single claim against all defendants for violation of the NYFCA (NYSFL § 187 et seq.), alleging that the defendants (i) "knowingly present[ed], or cause[d] to be presented a false or fraudulent claim for payment" to a government entity, (ii) knowingly [made], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claims," and (iii) conspire[d] to commit a[n] [NYFCA] violation" (NYSFL §§ 189[1][a]-[c]).
The defendants jointly move to dismiss (mtn. seq. no. 007), arguing that the Complaint (1) fails to allege the elements of a NYFCA claim with requisite particularity, (2) should be dismissed pursuant to the public disclosure bar, and, (3) with respect to the conduit bonds, because the state had no payment obligations. With respect to the public disclosure bar, New York's False Claims Act permits the State of New York to oppose a dismissal on public disclosure grounds (NYSFL § 190[9][b]). And, the Attorney General of the State of New York has notified the court that pursuant to NYSFL § 190 (9)(b), and as required in part by 13 NYCRR § 440.5(b), the State of New York would be exercising its right to object to dismissal of the Complaint on the basis of the public disclosure bar (NYSCEF Doc. No. 147). Accordingly, as discussed on the record at oral argument (2/24/2020), while the defendants reserve their right to object to the State's submission and to "present [the] public disclosure bar at a future date," the court will not address this argument by the defendants on these motions (NYSCEF Doc. No. 156, p. 5:8-24).
M & T also separately moves to dismiss (mtn. seq. 006), arguing that it did not submit a "false claim" because virtually all of its VRDOs are conduit bonds in which the costs were paid by private-equity borrowers, and, therefore, no government funds were at risk in these transactions.
As further discussed below, Relator has filed multiple similar cases around the country under analogous state false claims acts, containing nearly identical allegations that are the basis of the complaint here. Other courts addressing Relator's claims have come to differing conclusions. In Commonwealth ex rel. Rosenberg v JP Morgan Chase & Co. (the Massachusetts Decision), the Massachusetts superior court dismissed the qui tam complaint on the basis of the public disclosure bar, without addressing the additional grounds for dismissal raised by the defendants (36 Mass L Rptr 72; NYSCEF Doc. No. 61). As discussed supra, however, in the case at bar, the New York Attorney General has objected to this action being dismissed upon public disclosure grounds.
Two other courts have considered the issue and come to opposite conclusions. In State of Illinois ex rel. Edelweiss Fund LLC v JP Morgan Chase & Co. (the Illinois Decision), an Illinois county court rejected a joint motion by the defendants to dismiss the Illinois lawsuit, finding that:
. . . under the allegations asserted in the amended complaint, a reasonable person could, if the allegations were proved, infer that — with all the facts and circumstances asserted in the amended complaint — the VRDO interest rates were (1) objectively unreasonable in the industry of the municipal-bond market and, consequently, (2) the defendants' representations in their RMA agreements with Illinois (and other attended representations in the complaint) were objectively false when considered within those circumstances. Because the unreasonableness of such rates are substantial questions of fact suitable for the presentment of expert opinion, the court cannot determine that, as a matter of law, the "Robo-Resetting" and alleged collusion are insufficient bases to allege objective falsity under the [Illinois False Claims Act]"
(Case No. 2017-L-000289 [Cook County Cir Ct February 1, 2019], NYSCEF Doc. No. 62, p. 7).
With respect to the conspiracy aspect of Relator's claim, the Illinois Decision found that:
When the[] allegations are assumed to be true and reasonable inferences are taken in Relator's favor, an inference that defendants' conspired or agreed to "Robo-Resetting" to allegedly defraud Illinois into paying artificially-higher interest rates than it otherwise would under normal market conditions — where such collusion did not exist — is not unreasonable. Accordingly, the court finds there sufficient allegations of parallel conduct that could, if proved, lead a reasonable person to conclude that a agreement existed between the defendants.
(id., p. 8).
In California ex rel. Edelweiss Fund LLC v JP Morgan Chase & Co. (the California Decision), the San Francisco superior court granted the defendants' motion to dismiss with leave to replead because it found the complaint was not pleaded with sufficient particularity in that it did "not contain particularized allegations to the effect that any of the defendants represented to the state, in claims or otherwise, that they would comply with MSRB rules or SIFMA Model Disclosures," nor any "allegations identifying any particular remarketing agreements" (Case No. CGC-14-540777 [SF Sup Ct August 7, 2019], NYSCEF Doc. No. 60, p.15). To the extent that the [*5]complaint in that action referenced reoffering circulars as evidence of the terms of a certain remarketing agreement, the court found it insufficient because:
Plaintiff has not pled that these remarketing circular or official statements are the basis for the false claim — the basis for the false claim is the combination of the remarketing agreements allegedly described in the remarketing circulars or official statements, the failure to comply with those obligations, and the failure to report the noncompliance in the claim itself.
(id.).
With respect to conduit bonds, the California court declined to limit the scope of leave to amend to preclude allegations about conduit bonds in a prospective amended complaint (id., p. 19).
DISCUSSION
I. Standards Applicable to Defendants' Motion
A. Motion to Dismiss Standard
On a motion to dismiss, the pleadings are generally afforded a liberal construction and the facts as alleged in the complaint are accepted as true (Leon v Martinez, 84 NY2d 83, 87 [1994]). Pursuant to CPLR § 3211 (a)(1), the court may dismiss a cause of action where the documentary evidence conclusively establishes a defense to the claims as a matter of law (id. at 88). Dismissal under CPLR § 3211 (a)(7) requires the court to assess whether the proponent of the pleading has a cause of action and not whether he has stated one (id.).
B. Heightened Pleading Standard
Because Relator asserts a claim sounding in fraud under New York State Finance Law §§ 189 (a)-(c), its Complaint is subject to a heightened pleading standard under CPLR § 3016(b) and, therefore, must be stated "with particularity" (State of New York ex rel. Seiden v Utica First Ins. Co., 96 AD3d 67, 72 [1st Dept 2012]). However, in contrast to traditional fraud claims, to satisfy CPLR 3016(b), a qui tam plaintiff:
shall not be required to identify specific claims that result from an alleged source of misconduct, or any specific records or statements used, if the facts alleged in the complaint, if ultimately proven true, would provide a reasonable indication that one of more violations of [§ 189] are likely to have occurred, and if the allegations in the pleading provide adequate notice of the specific nature of the alleged misconduct to permit the state or local government effectively to investigate and defendants fairly to defend the allegations made"
(NYSFL § 192[1-a]).
Put another way, a heightened pleading standard applies to Relator's claims, but as modified by NYSFL § 192[1][a]. As the court (Masley, J.) in Total Asset Recovery Servs., LLC v Metlife, Inc. explained, "§ 192 (1-a) does not relieve a qui tam plaintiff of an obligation to plead facts with particularity it only relieves the plaintiff of an obligation to 'identify specific claims that result from an alleged course of misconduct'" (2019 WL 1470203, *9 [Sup Ct NY Cnty April 3, 2019] [citing Seiden, supra]). State of NY and NY City v Fieldturf USA Inc., cited by Relator in urging a more liberal pleading standard, is not to the contrary as it simply observes the [*6]application of NYSFL § 192 (1-a) to the general pleading requirements of CPLR § 3016 (2019 WL 2549578, * 2 [Sup Ct NY Cnty June 20, 2019]). 
II. Relator States a Claim Under the False Claims Act
The NYFCA "applies to any person who 'knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or local government'" (Anonymous v Anonymous, 165 AD3d 19, 27 [1st Dept 2017, citing NYSFL § 187 et seq. and People v Sprint Nextel Corp., 26 NY3d 98, 106 [2015], cert denied, 136 S Ct 2387 [2016]).
Specifically, and as relevant here, NYSFL§§ 189 (1)(a)-(c) imposes liability under the NYFCA on any person or entity who:
(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
(c) conspires to commit a violation of paragraph (a) [or] (b) of this subdivision.
Thus, to assert claims under NYSFL §§ 189 (1)(a)-(c), the Complaint must allege that each defendant (1) made a statement or claim to the State, (2) which was fraudulent, (3) with knowledge of its falsity, (4) that was material to the State's payment decision, and (5) that each defendant knew was material (New York ex rel. Khurana v Spherion Corp., 246 F Supp 3d 995, 998 [SD NY 2017). Because the NYFCA follows the federal False Claims Act (31 USC § 3729 et seq.), "it is appropriate to look toward federal law when interpreting the New York act" (Seiden, supra, 96 AD3d at 72, citing State of NY ex rel. Jamaica Hosp. Med. Ctr., Inc. v UnitedHealth Group, Inc., 84 AD3d 442, 443 [1st Dept 2011].
As discussed above, here, Relator's claims are primarily based on its allegations that the defendants (i) agreed to set the lowest possible interest rate for the VRDOs, and (ii) misrepresented that they would be doing so individually for each VRDO (e.g., Compl., ¶¶ 133-39). Instead, Relator alleges that the defendants "robo-reset" the interest rates of the VRDOs with different characteristics applying the same algorithm, and, accordingly, did not provide the lowest interest rates when they did so in violation of their obligations. 
Simply put, whether the defendants used a computer algorithm to set interest rates or not is immaterial. As the Massachusetts Superior Court noted in Commonwealth ex. rel. Rosenberg v JP Morgan Chase & Co., a suit brought by Relator in Massachusetts on behalf of the Commonwealth pursuant to its false claims act:
'Robo-resetting' is not a term generally in use in the securities industry, but rather one [*7]coined by the relator for this case. the relator has not alleged the existence of any statement by a defendant, rule, or industry standard that suggests that interest rates would not be set by use of computer programs, that of necessity, would be based on algorithms that should be designed to determine the lowest rates that could be set for these securities that would induce investors to purchase them at par (a process further described infra) given the characteristics of the issuer, the RMA, the financial institution that provided letters of credit securing repayment, and market conditions, i.e., cause the VRDOs to clear the market. The question of whether the rate was the lowest rate that could achieve the goal for a particular VRDO would be dependent on the skill with which the programs were developed and the nature of the inputs used, including whether they accounted for attributes unique to a particular issue and financial guarantor. To constitute fraud, a defendant would have to knowingly misuse technology to its advantage.
(36 Mass L Rptr 72, n 4 [Mass Super Ct July 23, 2019] [dismissing claims based on public disclosure bar without addressing other grounds]; NYSCEF Doc. No. 61[emphasis added]).
In other words, despite Relator's best efforts to imbue the term "robo-resetting" with negative connotations, there is nothing inherently wrongful about using a computer model to set the lowest possible interest rate for a given security, assuming that the lowest possible interest is the result. To be wrongful, either (i) the allegation must be that the algorithm was flawed or (ii) that it was applied in a flawed manner. 
In addition to the foregoing, Relator also alleges that the defendants wrongfully grouped collections of VRDOs into "buckets" and applied to each "bucket" collection of unrelated VRDOs "an identical pricing spread which move[d] the interest rate of each bond in the bucket up or down in lock step fashion" (Compl., ¶ 44). For instance, the Complaint alleges that Morgan Stanley grouped into a single "bucket" the following unrelated bonds and set their interest rates in lock-step fashion:
(i) A $1 billion issuance of general obligation bonds of the City of New York (CUSIP 649657MS9), which enjoy the "faith and credit" of the City and are used to finance "various municipal capital purposes," as well as "loan programs and other discrete municipal programs;" (ii) A $44 million issuance of conduit bonds for the Andrew W. Mellon Foundation (CUSIP 03444PAC6) to finance the cost of fixtures on the Foundation's real property; and
(iii) A $294 million conduit issuance of the Long Island Power Authority (CUSIP 542690L42) to finance electricity and power supply for customers
(Compl., Ex. E).
Relator argues that there is no economic or business justification for the lock-step pricing practice associated with bucketing these bonds as the highest quality bonds in the "bucket" (i.e., [*8]bonds for which investors will take a lower return and for which New York would consequently pay lower interest rates) should not be re-priced using the same high interest rate change as the lowest quality bonds.
Here, the Complaint sufficiently alleges that the defendants bucketed VRDOs that had different characteristics and applied the algorithm without taking into account the differences between the VRDOs in the buckets. And, as a a result, the defendants violated their obligations by (i) misrepresentingthat they were setting the lowest possible interest rate in remarketing agreements and other documents and by (ii) misrepresenting the performance of their remarketing and letter of credit services (Compl., ¶¶ 2, 115, 133-39; id., Exs. A-E). 
To the extent that the defendants' contend that Relator has not sufficient allegedly the falsity of their representations to individually price each VRDO at the lowest possible rate, Relator's forensic analysis of VRDO rates and market data is sufficient at this point to withstand a motion to dismiss (id., ¶¶ 108-13). As noted above, Relator compared VRDO rates to interest rates for 7-day AA non-financial commercial paper, a security that it contends is closely analogous to VRDOs (id., ¶ 108). Whereas historically VRDO rates have been significantly lower than commercial paper rates because VRDOs are tax-exempt and commercial paper is not (and, thus, investors expected a lower yield in return for the stability and tax exempt status of VRDOs), Relator's analysis found that, during the time period examined, average VRDO rates climbed statistically higher than commercial paper rates (id., ¶¶ 110-12). Inasmuch as the defendants argue that Relator "cherry-picked" the time period for its analysis and that all rates were informed by the 2008 financial crisis, this is an analysis that is better suited for a motion for summary judgment, following discovery, not a motion to dismiss.
Assuming these allegations to be true, as the court must, this is sufficient to allege a claim under the NYFCA as, if proven, such allegations would show that the defendants failed to set the lowest possible rates for at least some of these VRDOs. 
The fact that the SIFMA rules require the defendants to use "their judgment" to set the rates at the lowest rate that permits the sale of the VRDOs at 100% of their principal amount (par) on the interest reset date does not absolve the defendants of responsibility for doing so. At a minimum, whether the defendants set the lowest interest rate possible in their "judgment" presents a factual issue that cannot be resolved at the pleading stage.
Finally, to state a conspiracy claim under the False Claims Act, a relator must allege that (1) the defendants conspired with each other to get a false or fraudulent claim allowed or paid by the government, and (2) that one or more of the conspirators performed any act to effect the object of the conspiracy (see United States ex rel. Grubea v Rosicki, Rosicki & Assocs., P.C., 318 F Supp 3d 680, 705 [SD NY 2018]). Here, Relator adequately alleges conspiracy on the part of the defendants by pleading that (i) interest rates for hundreds of different VRDOs managed by multiple different defendants all moved in lockstep (Compl., ¶¶ 84-88, 95), (ii) the defendants had a joint response to certain key events such as a sudden VRDO interest rate move following a December 15, 2015 Federal Reserve rate hike (id., ¶¶ 89-90), (iii) overlap by defendants in coordinating same (e.g., where one defendant serves as RMA for a VRDO where another [*9]defendant is the LOC provider or a significant investor) (id., ¶¶ 96-102), and (iv) that the defendants used third-party pricing services such as the J.J. Kenny Index to coordinate their rate-setting activity (Rosenberg Aff., ¶ 4, NYSCEF Doc. No. 111). In addition, the Complaint alleges that a "senior" Bank of America employee confirmed that the defendants had met and coordinated their response to an April 2012 Bank of America credit downgrade by agreeing to keep buying Bank of America backed bonds so as to protect Bank of America from an investor run on those bonds which would result in Bank of America having to draw down the letter of credit it committed to supposed the bond (Compl., ¶ 94). Put another way, whether these allegations may ultimately be established, taken as a whole and assumed as true for purposes of this motion to dismiss, they are sufficient to allege that the defendants conspired to artificially create a market for municipal bonds with a higher rate than would otherwise exist. This is enough to plead a conspiracy claim at this juncture.
III. Relator States a Claim Against M & T Based on Conduit Bonds
M & T separately moves to dismiss because it claims that substantially all of its VRDOs are conduit bonds. Conduit bonds are a "subset of municipal bonds used to finance projects by private entities" (e.g., Department of Revenue of KY v Davis, 553 US 328, 333, n 2 [2008]). While the government is the issuer of the bonds, the actual borrower is a private entity. Thus, it is the conduct borrower that is liable for making debt service payments on the bonds, not the government issuer. The same holds for related fees and interest, which are also generally paid by the private entity borrower. 
M & T argues that, as a matter of law, it did not submit a "false claim" because "virtually" all (but not all) of its VRDOs are conduit bonds in which costs were paid by private-entity borrowers, and not the government. This argument misses the point.
The NYFCA "applies to any sort of looting of the public purse" (Seiden, supra, 96 AD3d at 71). In the case of conduit VRDOs, New York issues bonds to conduit borrowers (i.e., non governmental entities who advance certain key state interests) to develop various critical infrastructure using tax-exempt financing (Compl., ¶ 22). Conduit borrowers typically agree to repay the government issuer who pays the interest and principal on the bonds. Importantly, conduit VRDO borrowers obtain funds from New York, and thus, necessarily, some portion of New York's funds is included in the payments conduit VRDO borrowers made to M & T (see NYSFL §188[1][ii][A] [defining claim under the NYFCA as "any request or demand, whether under a contract or otherwise, for money or property that is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the state or local government's behalf or to advance a state or local interest, and if the state or local government has provided any portion of the money or property requested or demanded" (emphasis added)]).
Conduit borrowers made payments in response to demands for payment that M & T submitted, which, according to the Complaint, were tainted by false claims and statements. Moreover, under the NYFCA, M & T may be liable for making false claims or statements to an "agent of the state," which M & T may have done when it submitted invoices for RMA and LOC services to the bond trustees and/or paying agents (see NYSFL §188[1][ii]).
M & T's reliance on the Third Department's decision in United Food & Commercial Workers, [*10]Dist. Union, Local One v City of Schenectady Indus. Dev. Agency (UFCW) is misplaced (204 AD2d 887, 888 [3d Dept 1994]). UFCW was not an NYFCA case, but concerned a request for bond documents under the Freedom of Information Act (FOIA). The issue was whether an agency relationship existed between a trustee and a conduit issuer that would compel the trustee to maintain certain records of the issuer and produce them under FOIA. The Third Department, after reviewing the relevant bond documents, found that there was no "statutory or contractual obligation on the part of [the trustee] to maintain recordsby or for [the issuer]" (id. at 888 [emphasis added]). The Court concluded that, under those "circumstances" — i.e., for the purposes of maintaining records and complying with FOIA — no agency relationship existed. UFCW does not hold that, as a matter of law, no agency relationship ever exists between a trustee and a conduit issuer, only that no such relationship existed between the entities for purposes of FOIA. UFCW simply has no application to the instant matter.
United States ex rel. Grubea, supra, is more instructive (318 F Supp 3d 680). In that case, the defendant, a law firm, argued, among other things, that the complaint should be dismissed as regards certain reimbursement requests submitted by it to Freddie Mac and Fannie Mae because such requests were not "claims" within the meaning of the federal False Claims Act because Freddie Mac and Fannie Mae were not government entities but independent for-profit companies that happened to receive additional capital from the government during an emergency bailout (id. at 705). The defendant maintained that the complaint could not state an economic loss to the taxpayer. The court rejected the argument and denied dismissal on this basis, finding that the False Claims Act applies so long as any portion of the claim is funded by government funds (id. at 706, citing United States ex rel. Marcus v Hess, 317 US 537, 544 [the FCA "does not make the extent of [the funds] safeguard dependent upon the bookkeeping devices used for their distribution"]; see also NYSFL §188[a][ii][A]). Here, Relator alleges that New York provided the funds to the conduit VRDO borrower and therefore at least some portion of New York's funds was necessarily included in the payments that the conduit VRDO borrowers made to M & T in response to the allegedly false claims for payment that M & T submitted. The purpose of the False Claims Act supports such a "broad interpretation" (United States ex rel. Health v Wisconsin Bell, Inc., 111 F Supp 3d 923, 926-27 [ED WI 2015] [explaining federal False Claim Act must be interpreted broadly as "Congress has twice amended the FCA to broaden liability to correct what it viewed as incorrect, narrow court interpretations of the statute"]). The fact that, here, New York's money passed to M & T through private VRDO borrower entities "does not make the government any less its source" (id. at 926).
M & T also moves to dismiss the conspiracy claim against it. This aspect of M & T's motion fails for the same reasons as the defendants' joint motion to dismiss the conspiracy claim. In addition, as concerns the conspiracy claim against M & T, whether M & T actually received funds from New York is simply irrelevant to the analysis if M & T has conspired with the other defendants to commit a violation of either NYSFL §§ 189 (1)(a) or (1)(b). Payment by New York to M & T is not necessary if M & T colluded with the other defendants to defraud New York by automatically resetting the VRDO rates without regard to their individual characteristics at rates higher than the lowest possible rate and by acting in concert to prop up Bank of America VRDOs, as the Complaint alleges (see Allison Engine Co., Inc. v United States ex rel. Sanders, 563 US 662 [2008]). In other words, Relator's allegations that M & T colluded with the other [*11]defendants with the intent of having New York issue payments based on the higher interest rates, which New York allegedly did issue, are sufficient to state a conspiracy claim against M & T regardless of whether the payment was made to M & T or just the other defendants. 
Accordingly, it is
ORDERED that both motions to dismiss (seq. no. 006 and 007) are denied; and it is further
ORDERED that the defendants are directed to file an answer to the second amended complaint
within 45 days of the date of this decision; and it is further
ORDERED that the parties appear for a preliminary conference in Part 53 on June 1, 2020 at 11:30 A.M.
Date: 3/27/2020